No. 92-028

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

IN RE THE MATTER OF
M.A.W. and K.M.W.,

FILED

FEB 2 1993

CLERK OF SUPREME COURT
STATE OF MONTANA

Youths in Need of Care.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John Houtz, Attorney at Law, Forsyth, Montana
Marcey F. Schwarz, Schwarz and Gustafson, Billings,
Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Helena, Montana
Patricia J. Jordan, Assistant Attorney General,
Helena, Montana
John S. Forsythe, County Attorney, Forsyth, Montana
Garry P. Bunke, Attorney at Law, Miles City, Montana

Submitted on Briefs: June 11, 1992

Decided: February 2, 1993

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

After a hearing, the District Court for the Sixteenth Judicial District, Rosebud County, terminated the parental rights of the mother and the father (who were divorced at the time of the hearing) to their children, M.A.W. and K.M.W. The mother has not appealed the termination of her parental rights as to either child and is not a party to this action. The father appeals the termination of his parental rights as to K.M.W. only. We affirm.

The issues for our review are:

1. Were the statutory requirements for termination of parental rights met?

2. Did the District Court err in denying disclosure of evidence to the father?

3. Did the District Court err in refusing to replace Garry Bunke as guardian at litem after he began to work part-time as a deputy county attorney in another county?

4. Was the District Court biased in favor of the county?

5. Did the District Court err in declining to allow the child to testify?

Two daughters were born of the marriage, M.A.W. and K.M.W. In June of 1987, the father contacted Barb Rolston, a Department of Family Services (DFS) community social worker, because he was concerned about physical and emotional abuse by the mother of K.M.W. On June 22, 1987, the father filed a petition for dissolution of marriage and a supporting affidavit requesting that the court issue a temporary restraining order against the mother to

2

keep her away from the children. In his affidavit, the father averred that the mother had threatened to physically harm the children.

In January of 1988, the District Court requested that Barb Rolston look into the home situation of each parent in connection with the divorce action. Barb Rolston testified that before she could complete her home study the mother made a referral about possible sexual abuse of K.M.W. by the father's sister, Lynnette. Barb testified that when she first tried to interview K.M.W., "she had one of her screaming tantrums and I think either the next day or two days after, I received a referral from the Public Health Nurse regarding medical neglect." At that point, pursuant to court order, the DFS removed the children from the home and placed them in foster care.

At the hearing in June 1991, the foster mother testified that K.M.W. was two years old and M.A.W. was less than one year old when they came to live with her. She testified that "they were both very maladjusted children, quite upset, not physically cared for." She testified that K.M.W. had constant nightmares and awoke several times a night screaming. The foster mother testified that K.M.W. would act out different abuses that she had been through including acting out things being put into her vagina, her hands being tied up and trying to have sex with her little sister, M.A.W. The foster mother testified further as follows.

Q. Now, how would she act these things out; would she physically do these sorts of things to herself?

A. Right, right. And she would even, her voice would

3

even change as she began to say things that she was repeating and go through the motions of what had happened. She would hold her hands together and I'd ask her, "Why do you have your hands together?" "They are tied up." And I would ask her questions with each thing she did and she would respond.

. . .

Q. Now, you stated there was some acting out sexually with [M.A.W.]; what did you observe there?

A. She was constantly trying to insert things into [M.A.W.'s] vagina; whether it was a shampoo bottle sitting on the side of the tub or whatever she could . . .

The foster mother testified that K.M.W. told her that the "bad man" did these things to her and that "Mommy was the bad man".

In its June 1988 order declaring the marriage dissolved, the District Court found that the mother was not fit to care for her children and awarded physical and residential custody of the children to the father subject to continuing supervision by the DFS. The District Court specifically ordered that the father should not permit the children to have any unsupervised visitation with the mother.

Notwithstanding the order forbidding the same, two weeks later on June 24, 1988, DFS was informed that the father had left the children with the mother for approximately two days. Investigation by a social worker for DFS and Detective Skillen disclosed the children in the unsupervised custody of the mother, in direct contradiction to the order of the District Court. On June 28, 1988, the DFS filed a petition for temporary investigative authority. The children were removed from the mother's custody and

4

placed in licensed foster care.

On the basis of the DFS' allegations that K.M.W. and M.A.W. were abused, or in danger of being abused and neglected, within the meaning of § 41-3-102, MCA, the District Court granted the DFS temporary investigative authority. On August 19, 1988, an amended petition was filed, requesting continuation of the temporary investigative authority and temporary custody of the children for six months. Both the father and the mother consented to this request. The father had moved to Idaho during 1988 and the mother had moved to Utah. Following a hearing, temporary custody was granted to the DFS. A treatment plan was developed by the DFS and approved by the court on January 16, 1989.

The January 1989 treatment plan required that the father complete the following items:

1.  Enter and successfully complete a recognized parenting education program;

2.  Undergo a complete psychological evaluation and comply with recommended treatment;

3.  Enter into counseling with a professional mental health counselor to deal with the client's lack of assertiveness; to develop firm and effective methods of discipline; to understand the children's needs as victims of sexual offense; as well as physical and emotional abuse; and to deal with other issues identified in the evaluation;

4.  Complete a chemical dependency evaluation with a recognized chemical dependency counselor, and complete a treatment program if recommended;

5.  Arrange for a home visit to be done by the local social service agency and for a copy to be forwarded to the Department of Family Services;

6.  Request assistance from the local agency to arrange and coordinate services for the [above listed

5

objectives];

7.    Cooperate with the recommendations and requests of the local agency;

8.    Contact the children on a monthly basis, by writing letters to them;

9.    Confer with the supervising social worker regarding his own and children's current status.

On September 12, 1989, Barb Rolston filed a report with the court indicating that Idaho had denied placement of the children with the father because he did not have a place to live and had not completed any of the treatment plan.  Ms. Rolston indicated that the father's visits had been sporadic.  Her report further stated:

> [The father] continues to be too passive to parent or protect his daughters.  Because [the mother] has threatened to kidnap the girls and she is able to get information from [the father's] mother, [the father's] only requirement prior to visiting the girls was to agree to tell no one where they were.  When his relatives started writing to the foster homes, [the father] indicated he didn't see what it could hurt to tell them.  While he denies any alcohol problems, he has not completed an alcohol evaluation and he continues to be involved with other people who do have alcohol problems. . . . [the father] will need extensive counseling to be able to comprehend the effects of their abuse on the girls, to parent them effectively, and to protect them from further abuse.

> [K.M.W.] has been in a therapeutic foster home specializing in sexually abused children since November 7, 1988.  Until recently she was uncooperative in therapy and exhibited a great deal of anger.  Since joint sessions with [M.A.W.] began in June, [K.M.W.] has progressed more rapidly in therapy.  She will need to be in the program at least another six months.

> . . .

> Both children continue to need specialized therapeutic foster care.  Neither parent has obtained adequate housing nor completed court approved treatment plans.  Each girl has made separate and consistent allegations of sexual abuse by [the mother].  She continues to deny the

6

abuse and is therefore a poor candidate for therapy.

Based on that report, on September 19, 1989, the DFS filed a petition for temporary legal custody of both children. K.M.W. was four years old at the time of the petition. M.A.W. was two and one half years old at the time of the petition. The District Court granted the DFS temporary legal custody of the children in its order of September 21, 1989.

Pursuant to another petition by the DFS, on November 20, 1989, the District Court held a hearing in which the father, his current wife Billie Jo, and Barb Rolston all testified. The father testified as follows:

Q. [Father], do you realize that we are at a critical time as far as the kids are concerned right now?

A. Very much so.

Q. The professionals are saying that a decision has to be made as to permanent custody within the next six months?

A. Yes.

Q. You understand that?

A. Yes, I do.

Q. And that if you can't get your living situation to a point where they feel they can safely place one or both of the children with you, they will recommend placement outside the family?

A. Yes, I do understand that.

. . .

Q. And you understand that no one is blaming you for the sexual molesting?

A. Yes, I understand that now.

. . .

7

Q.   But do you also understand that just the fact that it happened that if [the mother] did this that that leaves the children with severe scars?

A.   Very much so.   It leaves me with severe scars knowing that it happened to them and I didn't know it was going on.

Q.   No one is asking that you take counseling for sexual abuse because you did it; you understand that?

A.   Mm-hmm.

Q.   It's because you need that to be able to deal with the children and also your own emotions?

A.   Yes, I understand that.

Q.   You are willing to submit to such counseling?

A.   Yes, I am.

The court found that it was not in the best interests of the children to be returned to the parental home of either the mother or the father; that the mother had made no attempt to comply with the court approved treatment plan; and that the father had only partially complied with the treatment plan.   In its order dated February 8, 1990, the District Court ordered the father to make substantial progress on the treatment plan within 90 days, and in pertinent part stated:

> Now, the criteria for determination are that there was an appropriate treatment plan that's not been complied with.   The second part of that is that the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable period of time. And for whatever the parents including the father, have not complied.
>
> I think it's the position of [DFS] that two years is a reasonable time.   The Court is affording an additional 90 days for substantial progress and with the entire treatment plan to be completed in six months.
>
> This will be approximately 2 1/2 years and although

8

> there are very fundamental rights as far as the rights of natural parents, those rights are secondary to the rights of the children and what is in the best interest of the children.
>
> And at this point, it is imperative that the best interest of the children be served by permanency within a very -- within a fairly short period of time at this time. (Emphasis supplied.)

On May 24, 1990, Barb Rolston filed another report with the District Court. That report showed that the father had failed to schedule any of the required treatment for six weeks, notwithstanding the requirement on the part of the District Court. The report demonstrated that the father had not participated in parenting classes; and that both the father and his wife, Billie Jo, chose not to follow K.M.W.'s daily schedule or familiar discipline procedures, which created some of K.M.W.'s inappropriate behaviors. Ms. Rolston further noted that K.M.W. wanted to live with her father and that she would "effectively undermine any attempt to place her with another family." Ms. Rolston recommended that K.M.W. be placed with her father as soon as possible.

On June 8, 1990, the deputy county attorney, Gary Ryder, filed a stipulation between the county and the father, that K.M.W. would be placed with him and that he would assume full financial responsibility for her care. Immediately upon being placed in the father's home, which then was in Idaho, five year old K.M.W. sexually assaulted her stepmother's baby girl (Baby C). This was reported to the Rosebud County Attorney by a relative of the father's. The Idaho Department of Health and Welfare social worker who had worked with the father since January revealed that she had

9

never been informed of the incident with Baby C. Furthermore, the father failed to follow through with the Idaho welfare services. K.M.W. was removed from his home again and returned to foster care in Montana.

After K.M.W. was returned to foster care in Montana, Ms. Rolston reported that the father remained in only sporadic contact with K.M.W. and failed to keep a number of promises which he had made to her. Ms. Rolston concluded that K.M.W. had fewer problems in foster care than she had prior to her Idaho visit and that she had began asking for a new daddy. She concluded that K.M.W. would adjust to an adoptive placement and that because she may revert to inappropriate sexual behaviors if her situation is too stressed or unstructured, she needed to be in a stable environment, which the father had never provided for her. Ms. Rolston testified to the pattern of conduct on the part of the father which extended over the past three years, stating in pertinent part:

> Over the past three years [the father] has continued to demonstrate a pattern of denial and inappropriate responses that endangered not only his own daughters, but other young children as well. Aware of services available to deal with his family's crises he has not sought assistance. He has left his young daughters in their natural mother's care, knowing she had molested them; he enrolled [K.M.W.] in a pre-school without advising staff to protect other children; he left his already exhausted wife to deal with issues of protecting her own child from [K.M.W.]. The birth of another child in that home creates another potential victim to protect. The reconciliation is too recent to be considered stabilized and Billie Jo has expressed serious reservations about parenting [K.M.W.].

Ms. Rolston recommended that the father's parental rights be terminated and that K.M.W. be permanently placed as soon as

10

possible. On December 31, 1990, a petition for the termination of the parental rights of the father was based upon the failure of the treatment plan. Following a hearing held on June 17, 18 and 19, 1991, the petition was granted. The father filed a motion for a new trial, which was denied. He now appeals the termination of his rights as to K.M.W.

I

Were the statutory requirements for termination of parental rights met?

Section 41-3-609, MCA, provides the criteria required for the termination of parental rights. It provides (in part):

> (1)    The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
>
>                     . . .
>
> (c)    the child is an adjudicated youth in need of care and both of the following exist:
>
> (i)    an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii)    the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or
>
> (d)    the parent has failed to successfully complete a treatment plan approved by the court within the time periods allowed for the child to be in foster care under 41-3-410 unless it orders other permanent legal custody under 41-3-410.
>
> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental

11

care. In making such determinations, the court shall consider but is not limited to the following:

. . .

     (g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

     (3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the chile.

. . .

The State has the burden of showing by clear and convincing evidence that the statutory criteria for the termination of parental rights have been met. Matter of A.W. (1991), 247 Mont. 268, 806 P.2d 520. A presumption of correctness is afforded the district court's determination, and the decision to terminate parental rights will not be disturbed on appeal unless there is a mistake of law or a finding of fact not supported by substantial credible evidence that would amount to a clear abuse of discretion. Matter of S.P. (1990), 241 Mont. 190, 194, 786 P.2d 642, 644.

The father vehemently argues that he completed the treatment program. The record demonstrates that the father failed to comply with the January 1989 treatment plan in several respects. In particular, the father failed to enter into counseling with a professional counselor to deal with his lack of assertiveness, to develop firm and effective methods of discipline, to understand the children as victims of sexual offense as well as physical and emotional abuse, and to deal with other issues identified in the evaluation. The father emphasizes that K.M.W. had expressed her desire to live with him and stated in letters to him how much she

loved him. He submitted copies of phone bills as evidence of his telephone calls to K.M.W., and photographs of his current home in Idaho as evidence that he had a proper home for K.M.W. to live in. The father acknowledges that he made a mistake in allowing the mother to be with the two children in an unsupervised capacity in 1988. With regard to the sexual assault of Baby C by K.M.W., the father contends that by sitting K.M.W. down and talking to her about it, he properly handled the situation. He maintains that the testimony of Billie Jo and his mother that he is a good father who loves his children is further evidence that his parental rights should not be terminated.

Ms. Rolston of the DFS, testified at length as to the severe problems on the part of K.M.W. and the inability of the father to deal with such problems. In pertinent part she testified:

[Questioning By Guardian Ad Litem Bunke]:

Q: Does it appear to you that a lot of these moves relate to his lack of assertiveness with other people?

A: One of the evaluators indicated that [the father] takes the path with least resistance and I think that if something comes up that presents an issue then [the father] moves on, either to get away from that issue or because it's the easiest thing to do.

Q: And in dealing with his children, does assertiveness become an issue or a problem, especially as it relates to [K.M.W. and M.A.W.]?

A: [K.M.W.] is probably the most manipulative preschool child I have ever seen. She is very intelligent, very, very, very, controlling. And I don't think [the father] would stand a chance of being the head of the household with [K.M.W].

[By Father's Attorney]:

Q: Now, someone has describe these children as having

13

special needs. Would you describe them as having special needs?

A: Yes.

Q: And would you describe what some of these special needs are. For example, maybe you can begin with [K.M.W.].

A: [K.M.W.], . . . requires a high level of consistency. . . . She -- [K.M.W.] required over six months to become comfortable with me as a therapist. I've never had a child who was that fearful in my sixteen years of practice with children. She is a very easily frightened child, needs security, needs to know that there's predictability in her environment. She can't tolerate instability. That's not good for any children. But [K.M.W.'s] needs -- it's higher than most children. And it appears to be related to her traumatic experiences prior to placement. She needs to have parents who -- because of that need for consistency and stability, she needs to have parents who can anticipate concerns in her environment, who can realize that she will be upset and prepare her for any kind of change. Without that, she's probably going to regress to the level of behavior that she had when we got her, which was screaming and withdrawing whenever she became uncomfortable. And I'm not talking about a child simply screaming for a few minutes. This is a child who would scream for incredible lengths of time. . . . In addition to those behaviors that are a real concern, she will continue to require a high level of supervision. She continues to be sexually aroused by other children. And because of her age and developmental state, she's not able to completely handle those feelings on her own. So she'll require parents who understand and can supervise her so that she doesn't -- is not placed in a situation where she may be sexually aroused by other children and, hence, display sexual behavior toward them. I think it's really important to understand that if we place children with other children and inadequate supervision when they are -- when they do have an arousal pattern, we really victimize them as well as the other child. . . .

Ms. Rolston also testified that the family assessment revealed things that the father had not shared with them. For instance, she testified that when K.M.W. was placed in his care, the father did not follow the schedule provided for K.M.W. to follow for even one

14

day. She testified that when K.M.W. was not in the father's care he moved without telling the DFS where he was going and failed to contact K.M.W. within two days as he had promised her. Instead it took three weeks before he contacted her. When he did contact K.M.W., he made promises to send her things and then failed to keep his promises.

The District Court determined that K.M.W. was abused or neglected as defined in § 41-3-102, MCA, and also adjudicated her to be a youth in need of care as required under § 41-3-609(1)(c), MCA. In regard to the treatment plan, and the failure on the part of the father to complete the same, the District Court made the following finding:

> 15. [The father] has failed to complete his treatment plan in that he has failed to maintain the required contact with the social worker, Barbara Ralston (sic); he has failed to maintain regular contact with the children; he has failed to obtain specialized treatment to increase his awareness and ability to cope with the behaviors of a child who has been sexually abused and who may sexually abuse others; he has failed to obtain assertiveness training to bolster his ability to parent an intelligent, manipulative child or an out of control child, both with special needs.

We have carefully reviewed the extensive transcript and conclude that there is substantial, if not overwhelming evidence that the father did not comply with critical parts of the January 1989 treatment plan. In particular, while he did receive some psychological evaluation, he failed to complete any treatment as recommended by such evaluations. In addition, he failed to enter into counseling with a professional counselor to deal with his own lack of assertiveness and to develop the effective methods of

15

discipline which were required. In addition, such counseling would have helped him to understand the children's needs as victims of sexual offense and the physical and emotional abuse and to deal with other issues identified in the evaluation. Unfortunately, the father continues to deny various aspects of the sexual offenses against his children and the need for treatment. In that regard, the District Court made the following finding:

16. After [the father] made some progress on the treatment plan, in the late Spring of 1990, at the request of [K.M.W.] and on the recommendation of the treating professionals, [K.M.W.] was temporarily placed with her father, [he] and his current wife, Billie Jo. The placement resulted in some competitive behavior, yelling and screaming, of [K.M.W.] and her new stepsister [Baby C]. Ultimately, [K.M.W.] sexually assaulted [Baby C], a younger child, twice. Billie Jo, who had attended special classes for non-offending parents of sexually abused children, wanted to report the incidents to DFS and seek appropriate assistance. [The father], asked Billie Jo not to report the incident as he was afraid that DFS would remove [K.M.W.]. Billie Jo acquiesced in this decision and the matters were handled by [the father] and Billie Jo talking to the children and telling them that they should not do such things. DFS discovered the abuse through other family members, immediately investigated. [K.M.W.] was removed from her father's home in late July 1990 and returned to her specialized foster care home on August 3, 1990. [K.M.W.] was removed, not because of her acting out, but because of her father's denial and apparent inability or unwillingness to seek appropriate assistance to help [K.M.W.] with her special needs. (Emphasis added).

The father contends that the Idaho report demonstrates that he and Billie Jo had followed their treatment plan and that a multitude of other documents establish attendance at parenting classes, classes involving care and treatment of sexually abused children, and other things that Idaho requested. However, as the District Court pointed out, the father's testimony throughout this

16

entire process has wavered with respect to whether he will even admit that there has been sexual abuse and testified that he would comply "if it was necessary". The record contains uncontradicted evidence that K.M.W. was seriously sexually abused. However, in spite of the DFS' constant prodding of the father in an attempt to get him to comply with the plan, he still refused to do so.

Since K.M.W. has returned to her foster home, the father's contact with her has again been sporadic and he has continued to break promises to her. The District Court granted the father an additional six months to complete the treatment plan, which allowed him a total of more than 2 1/2 years to comply. We agree with the District Court's conclusion that there is overwhelming evidence that the father did not fully comply with the treatment plan and that the condition is unlikely to change within a reasonable period of time. We therefore hold that the District Court properly ordered a termination of the parent-child legal relationship under § 41-3-609, MCA. The record clearly demonstrates that K.M.W. is an adjudicated youth in need of care and that an appropriate treatment plan had been approved by the court and was not complied with by the father, and that the conduct or condition of the father rendering him unfit is unlikely to change within a reasonable time.

Although we affirm the District Court's decision to terminate parental rights for the reasons stated above, we also point out that the District Court could have terminated the father's parental rights in this case under §41-3-410, MCA. That section provides (in part):

17

The court may terminate parental rights under 41-3-609(2) or order other permanent legal custody that will provide for the permanent placement of the child when legal custody of a youth has been transferred to the department under this part and:

. . .

(2) the child has been in an out-of-home placement for a cumulative total period of 2 years or longer pursuant to court order, the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement, and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

K.M.W. has been in out-of-home placement for more than two years. Furthermore, as already discussed, the record supports the District Court's finding that the father has failed to comply with the treatment plan and there is a substantial likelihood that he will not be capable of exercising proper and effective parental care and control in the near future.

We recognize the dilemma in which the District Court was placed in reaching its decision on this issue. The father has testified at length as to his love of K.M.W. Notwithstanding such love, he has demonstrated his inability to recognize the sexual abuse perpetrated upon his daughter and the extent of the damage which that has caused her, both psychologically and emotionally. As a result, he has not in good faith completed a program which would allow him to deal with this aspect of his daughter's care. Evidence of a loving relationship does not counter balance the extensive need for care on the part of K.M.W. in order that she may develop, notwithstanding the mistreatment she has received. The best interests of K.M.W. clearly outweigh the claim on the part of

18

the father.

We hold that the statutory requirements for terminating the parental rights of the father were met by the District Court.

II

Did the District Court err in denying disclosure of evidence to the father?

On April 19, 1991, the father moved for sanctions under Rule 36(b)(2)(B), stating that he had been denied preliminary discovery by the county attorney's office. The State responded by an objection to the disclosure of reports prepared by foster parents, claiming the reports were privileged information. Following that objection, in May 1991, the father moved for an "in camera" inspection of the entire DFS file.

In its pretrial order dated June 6, 1991, the District Court stated that the father's attorney had requested an "in camera" inspection of the entire DFS file by the attorneys for the father. An "in camera" inspection by definition is made by the court--not counsel for defendant. While acknowledging this fact, the court suggested that counsel describe the type of documents in which the father was interested so the DFS had an opportunity to advise the court of the parts of the voluminous file which were deemed confidential and should not be disclosed. The court suggested that after the "in camera" examination it would then determine what was relevant and necessary to the father. The court emphasized that the father had not in any way identified what he was looking for. The court ordered the DFS to bring the file to the court for trial

19

so that the court could properly reconsider the motion. At trial the father's counsel failed to furnish any type of identifying information and the motion for inspection of the voluminous files was denied.

Subsequently the father moved for a new trial. One of the grounds was the denial of inspection of the DFS file. In its order denying the father's motion for a new trial, the court stated:

> With respect to Counsel's request for disclosure of evidence, the Court has two explanations. First, it was the Court's understanding at the pretrial conference that the Respondent-Father had everything that he needed, Counsel should file a prompt motion specifying the particular information needed, the Department could then mark the information in the voluminous file and also mark any information in the relevant portions of the file, it considered confidential. The Court would then examine the file and decide which information was relevant and should be disclosed. Second, when the request for examination of the Department of Family Services file was repeated by counsel, it did not specify the information requested or delimit it in any way. Counsel for the Respondent-Father wanted to conduct an "in camera" inspection of the entire file himself. It appeared to the Court that counsel was merely on a fishing expedition and did not approve the same.

The applicable statute on this issue is § 41-3-205, MCA, which in pertinent part provides:

> (1) The case records of the department of social and rehabilitation services . . . and the court concerning actions taken under this chapter and all records concerning reports of child abuse and neglect shall be kept confidential except as provided by this section. Any person who permits or encourages the unauthorized dissemination of their contents is guilty of a misdemeanor.
> (2) Records may be disclosed to a court for in camera inspection if relevant to an issue before it. The court may permit public disclosure if it finds such disclosure to be necessary for the fair resolution of an issue before it.

The dissent focuses on the impossibility of the father and his

20

counsel identifying the information needed when they did not know what information was contained in the file. The District Court did not require an impossibility on the part of the father or his counsel, but made a practical decision. The court was presented with a lengthy file. District courts have control over the presentation of evidence so as to avoid needless consumption of time. Rule 611(a)(2), M.R.Evid. Further, district courts have inherent discretionary power to control discovery; such power is based upon the court's authority to control trial administration. Massaro v. Dunham (1979), 184 Mont. 400, 603 P.2d 249.

It is essential to look at the record with regard to the events as they took place. The record shows that the father's counsel did not request an "in camera" inspection by the court. Instead he continued to request that as counsel for the father he should be allowed to conduct an "in camera" inspection of the entire file. Such inspection was by definition impossible; the court correctly noted that it was not appropriate under the above statute. The record further demonstrates there was no attempt by counsel for the father to in any way delineate the nature of the information desired. This failure to even attempt to comply with the court's concern underscores the court's "fishing expedition" analysis. As the court pointed out at the pretrial conference, it understood that the father had everything which he needed to try the case.

As requested by the court, counsel could have listed the materials which had been furnished to him and thereby identify

21

information which he did not need. With little effort, counsel could have stated that information was desired only as to K.M.W. This would have significantly diminished the volume of material needed for review. In addition, he could have eliminated such elements as the following: reports of foster parents, reports of personnel employed by the various divisions of the State of Montana, reports by personnel in the state of Idaho, reports by law enforcement personnel, and reports of psychologists or other medical personnel. We emphasize that after being warned of the necessity to limit or identify the information required, counsel refused to do anything of that nature. The District Court concluded counsel was merely on a fishing expedition and therefore refused to approve it.

Under the statute the District Court is given the discretion to determine if the evidence is relevant to an issue before it. It is given the discretion as to whether to conduct the "in camera" examination at all. In view of the failure on the part of counsel for the father to attempt to limit or specify the information requested in any manner, we conclude that the father has failed to prove the District Court was clearly erroneous in denying disclosure of access to the entire files. We therefore hold that the District Court did not err in denying disclosure of evidence to the father.

III

Did the District Court err in refusing to replace Garry Bunke as guardian at litem after he began to work part-time as a deputy

22

county attorney in another county?

The father contends that the District Court erred in allowing Garry Bunke to remain as guardian ad litem in this case after he became deputy county attorney in an adjoining county. The father maintains that a conflict of interest arose at that point because as guardian at litem, Garry Bunke would no longer be able to remain neutral but would rather, be clouded by the position he should take as an attorney for the State. The State maintains that there was no natural or apparent conflict between representing the State in one county and a child in another.

In its order denying the father's motion to appoint an unbiased guardian ad litem, the District Court stated:

> The Respondent-father's attorney, Mr. Houtz, alleges that the guardian ad litem, Mr. Bunke, is not sufficiently neutral, because Mr. Bunke is also a Deputy Custer County Attorney and because at the pretrial, Mr. Bunke indicated that he went along with the contentions of the state. This is insufficient evidence that Mr. Bunke is anything less than an impartial guardian ad litem. Mr. Bunke has been a Deputy County Attorney for two and one-half years. Prior to that, he was a defense counsel and frequently represented parents and children in such matters. Just because he agrees with the Rosebud County Attorney in this case does not mean he is not adequately representing the children.

We agree with the District Court's reasoning. Furthermore, § 41-5-512, MCA, provides that the court may not appoint an employee or representative of a party as a guardian ad litem. First, at the time that Mr. Bunke was appointed as guardian ad litem, he was not a deputy county attorney. Second, as Deputy Custer County Attorney, Mr. Bunke is not an employee or representative of the DFS or Rosebud County. He is an employee of Custer County. Therefore,

23

the District Court did not err in refusing to replace Mr. Bunke as guardian ad litem.

IV

Was the District Court biased in favor of the county?

In the 1989 hearing on the petition for temporary legal custody, the District Court stated:

> The Court will continue the temporary custody with the Department for a period of six months and the Court would implore the father to complete his treatment plan and would indicate that he has 90 days within which to substantially or make substantial progress and this is to be monitored by the Department of Family Services.
>
> If the father is not making substantial progress at that point, the Court would urge the Department then to make a decision as to whether or not to move, petition the Court for termination of all parental rights.
>
> This is not something that the Court seeks and the Court certainly can empathize with the natural father in this situation and also as stated by the County Attorney, but one of the primary needs of the children is for stability and continuity and the children are at such an age where a decision has to be reached.

The father maintains that in the above language, the District Court ordered the Rosebud County Attorney to file a petition for termination of the father's parental rights, committing reversible error. We disagree.

Read in context with the rest of the court's decision, there is no indication that the court ordered a petition to be filed against the father, or that the court had prejudged the case. Rather, the court empathized with the father and attempted to spur him into action to try to keep his family together. We hold that there is no evidence that the District Court was biased in favor of Rosebud County.

24

Did the District Court err in declining to allow the child to testify?

On May 7, 1991, the father moved to allow K.M.W. to testify that she desired to live with her father. The State opposed the motion arguing that K.M.W.'s wishes were irrelevant to the issue of whether the father successfully complied with the treatment plan, and that K.M.W. was not competent to testify.

The District Court denied the father's motion on the basis that the parties had stipulated that K.M.W. would say that she desired to live with her father. In the making of its findings and conclusions the District Court clearly recognized that K.M.W desired to live with her father.

In addition the District Court also mentioned that the parties also stipulated that the father's counsel could observe the interaction between K.M.W. and her therapist if they wished to do so, in order to avoid further traumatization of the child. The District Court concluded that the threatened harm to the child outweighed any possible relevance the testimony as to custody would have.

We agree with the District Court's reasoning. We hold that the District Court did not abuse its discretion in refusing to have K.M.W. testify.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice Terry N. Trieweiler, concurring in part and dissenting in part.

I concur with those parts of the majority opinion which resolve issues numbered III, IV, and V. I specially concur with the result arrived at in the majority opinion relating to Issue I, although I strongly disagree with much of what is said in that part of the opinion. I join Justice Gray's dissent to the majority's conclusion under Issue II.

After personally reviewing the testimony upon which the District Court relied before terminating the parental rights of Jack Watson, I strongly disagree with the majority's characterization that there is overwhelming evidence that he failed to comply with critical parts of the treatment plan he was ordered to follow. There was evidence that in at least one respect he did not comply with a comprehensive and detailed set of obligations imposed upon him.

I also disagree with the majority's statement that he failed to complete treatment that was recommended as a result of the evaluations that he underwent. He submitted to psychological evaluations and alcohol abuse evaluations. The conclusions from those who evaluated him was that he had no psychological abnormality which required treatment and that he was not abusing alcohol.

I also disagree with the majority's statement that Mr. Watson continues to deny various aspects of the sexual offenses against his children. He testified repeatedly during the hearing that

27

while it was initially difficult to acknowledge that his children had been abused while living in his home and under his care, he was now completely resigned to the fact that abuse had occurred and that his children suffered severe personality disorders because of that abuse.

Finally, I disagree with the majority's statement that in spite of prodding, Mr. Watson has refused to comply with his treatment plan. It is true that because of relocation, the unavailability of many of the services that were necessary, and instability in his own personal life, it took him longer to comply with the program than would have been desirable. However, I conclude from my review of the evidence in this case, that prior to June 1990 when K.M.W. was last placed in her father's custody, he had complied in most significant respects with the treatment plan that had been designed for him.

My interpretation of § 41-3-609, MCA, is that a district court may order termination of a parent-child relationship where:

1. The child has been adjudicated a youth in need of care, and

2. A treatment plan has not been complied with, and

3. A condition rendering a parent unfit is unlikely to change within a reasonable time.

In determining whether a parent is unfit, I conclude that all that needs to be shown under § 41-3-609, MCA, is that some condition of the parent renders him unable to give the child adequate parental care.

28

Although I do not agree with the characterization of the evidence set forth in the majority opinion, I do agree that the State offered sufficient evidence to create factual issues on each of these necessary elements. Furthermore, while based on my own review of the transcript, I may not have resolved those factual issues in the same manner as the District Court did, I acknowledge that there was a sufficient basis in the record for the District Court to make the findings that it made, and I recognize the unique position that a District Judge is in to resolve factual issues. In spite of these conclusions, I believe the result in this case is unfortunate.

Jack Watson is a father whose daughters were sexually abused by his former spouse. He neither participated in the abuse, nor was he aware that it was occurring. When he first had reason to suspect that his daughters had been abused, he reported his suspicions to the Department of Family Services, which eventually removed his children from his home.

As a result of their sexual abuse, his daughters have developed personality disorders to such an extent that their care requires skills over and above those possessed by the average parent.

Even though he had never personally abused nor neglected his daughters, Jack Watson was ordered to comply with a treatment program in order to retain his rights as a parent. The treatment program was comprehensive. It required evaluation and counseling.

29

I am sure that Jack Watson, based upon his training and instincts as a parent, felt that since he was not the offender that the treatment program made no sense and was imposed upon him by people who had little understanding of his personal relationship with his daughters. However, it is apparent to me from my review of the record that he made an effort to technically comply with the program without any conviction that the treatment program would benefit either his daughters or him. It is also clear to me from my review of the testimony that he believes he did comply with the treatment program.

Yet, there was evidence that in one respect he did not comply. He did not enter into counseling for the specific purpose of dealing with his alleged lack of assertiveness or to develop effective methods of disciplining his daughter and understanding her special needs as a victim of abuse. Whether or not that was a practical requirement, and whether or not it was reasonable to expect there would be any benefit to Jack Watson or his daughters from such counseling, was not an issue in the District Court, and has not been raised as an issue in this Court. Therefore, I conclude that there was a factual basis in the record from which the District Court could find that K.M.W.'s father did not follow the treatment plan.

The second requirement under § 41-3-609, MCA, for termination of parental rights is that a condition renders the parent unfit to care for his child and that the condition is unlikely to change within a reasonable time. It is the consideration of this factor

30

which makes this case unique among those cases I have seen dealing with the termination of parental rights. From everything I have seen in this record, Jack Watson is a loving parent who cares for his daughters and is loved by them. There is no evidence that he has ever mistreated his daughters. Yet, because of his former wife's mistreatment of his daughters, they have demonstrated severe emotional problems which require care and understanding beyond that which the average parent is capable of giving. Therefore, under the unique circumstances of this case, there was, through the testimony of Barb Rolston and Marty Jones, what I believe to be a bare minimum of the credible evidence necessary to sustain the District Court's finding that this father, even though otherwise qualified to be a parent, was unfit to care for K.M.W. who had such unique and special needs.

My interpretation of § 41-3-609(2), MCA, is that a parent may be found unfit to care for his or her child and unlikely to change within a reasonable time if the court finds that the conduct or condition of the parent renders him unable to give the child adequate parental care. While I find no evidence anywhere in this record to support a conclusion that Jack Watson ever abused or neglected either of his daughters, I do find sufficient evidence, through the testimony of the previous witnesses, for the District Court to find that Jack Watson was unable to provide adequate care for his daughter K.M.W. I must emphasize that reading the same testimony that the District Court heard and observed, I would not necessarily resolve the factual dispute as the District Court did.

31

However, it is not my right to resolve that factual dispute when the District Court, from its perspective, was in a better position to do so.

I feel the result of this decision is unfortunate. It should be of concern to everyone who believes in the fundamental importance of family relationships that a parent-child relationship can be terminated, not because of something the parent has done wrong, but because the parent's skills are average or even below average. That is, in effect, the result of the holding in this case. The father, whose rights are being terminated in this case, is as good a parent and as able to care for his children as most parents. His only inadequacy, at least according to most of the evidence that was presented, is that he has not developed special skills beyond those possessed by the average parent which would enable him to deal with the damage inflicted on his children by his former spouse. Because of the importance and sanctity with which I regard the parent-child relationship, and because of the degree to which the very nature of the relationship can compensate for a parent's inadequacies, I have serious reservations about the wisdom of the public policy as set forth in our statutory law which would permit termination of the parent child relationship under these circumstances. However, where the legislature's intent is clear, as it is in this case, and where the constitutionality of what the legislature did is not an issue, it is not for this Court to ignore the stated public policy and establish its own.

32

For these reasons, although I strongly disagree with its characterization of the evidence in this case, I reluctantly concur with the result of the majority opinion.

_____
Justice

I concur in the foregoing concurrence and dissent of Justice Trieweiler.

_____
Justice

Justice Karla M. Gray dissenting.

I respectfully dissent from the majority opinion on Issue II.

This case concerns one of the most fundamental and important rights recognized by the law: the right of a parent to parent his children. Here, in an effort to stave off termination of that right by the State of Montana, the father requested records and files of the Department of Family Services (DFS) in order that he might obtain and utilize any relevant information contained therein in his "defense" to the action to terminate his parental rights. The majority affirms the District Court's imposition of a precondition to an _in camera_ inspection which, as a practical matter, is an impossibility. More importantly, it affirms a precondition not provided for in the controlling statute, and does so without citation to any authority. I cannot agree.

The District Court required the following in denying the father's request for an _in camera_ inspection:

> Counsel who seek discovery of documents contained in the DFS file must specify or describe the documents they are particularly interested in. . . . The Respondent-father has not sufficiently identified what he is looking for.

The court went on to say that it would reconsider the motion at the time of trial "if counsel can sufficiently identify particular documents, types of documents, time frames, and other identifying information. . . ."

The majority attempts to reconstruct the record by suggesting that the court requested counsel to list the materials he already possessed, thereby identifying unneeded information. Such an

34

effort by counsel would not have met the court's requirement to specify, describe or identify the information being sought, as quoted above. Similarly, the majority's listing of materials the father "could have eliminated" is nothing more than speculation by this Court and, again, not responsive to the District Court's Memorandum and Order dated June 6, 1991. In any event, some of the majority's listed items might well have been relevant and, therefore, sought by the father if contained in the DFS file.

The fact is that neither the District Court nor the majority suggest how the father could have complied with the District Court's precondition. It strikes me that such a precondition requires an impossibility; neither the father nor his counsel could possibly know with particularity what documents and information the file contained. In this regard, the majority requires an impossible act in contravention of the statutory maxim of jurisprudence that "[t]he law never requires impossibilities." Section 1-3-222, MCA.

More importantly, nothing in the statute permitting disclosure of DFS files, § 41-3-205, MCA, requires the act imposed by the District Court and affirmed by the majority. To that extent, the majority violates its most basic duty, as stated in § 1-2-101, MCA: to ascertain and declare what is contained in a statute and to refrain from inserting that which is not found therein.

Section 41-3-205, MCA, is clear and straightforward: DFS records may be disclosed to a court for in camera inspection if relevant to an issue before it. It is undisputed that the records

35

concerning the father's children may contain information relevant to defending against the State's effort to terminate his parental rights. Indeed, the District Court recognized and stated that the records may contain relevant information which should be disclosed pursuant to the statute.

Here, the statutory procedure has not occurred; it was foreclosed by imposition of the precondition. There has been no in camera examination and no release of relevant information to a parent seriously and vigorously contesting termination of the right to parent his children. The majority concludes that the District Court's imposition of a precondition that the father specify what information he needed from the file, a requirement not contained in the statute, did not constitute an erroneous denial of access to the record. Nothing could be further from the truth. I dissent.

_____
                    Justice

36

February 2, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

JOHN HOUTZ
Attorney at Law
P.O. Box 1230
Forsyth, MT 59327

Marcey F. Schwarz
SCHWARZ & GUSTAFSON, P.C.
P.O. Box 21386
Billings, MT 59104

HON. MARC RACICOT, Attorney General
Patricia J. Jordan, Assistant
Justice Bldg.
Helena, MT 59620

John Forsythe
County Attorney
Drawer M
Forsyth, MT 59327

Barb Rolston
Department of Family Services
P.O. Box 241
Forsyth, MT 59327

GARRY P. BUNKE
Attorney at Law
P.O. Box 1407
Miles City, MT 59301

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA