Argued and submitted October 13, 2000, affirmed March 14, 2001

STEVEN A. KAHN,
Personal Representative of the Estate of
Corrine M. Tabert,
*Respondent,*

*and*

STATE OF OREGON,
Acting by and through
STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Intervenor below,*

*v.*

PONY EXPRESS COURIER CORPORATION,
aka Pony Express Delivery Services, Inc.,
and William S. Colton,
individually,
*Appellants.*

(9710-08258; CA A104742)

20 P3d 837

Thomas M. Christ argued the cause for appellants. With him on the opening brief were Mitchell, Lang & Smith and Danny L. Hitt, Jr., James L. Hiller, and Hitt, Hiller & Monfils.

Roy Pulvers argued the cause for respondent. With him on the brief was Lindsay, Hart, Neil & Weigler, LLP.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Michael C. Livingston, Assistant Attorney General, filed a brief *amicus curiae* for State Office for Services to Children and Families.

Before Wollheim, Presiding Judge, and Deits, Chief Judge,* and Brewer, Judge.

BREWER, J.

---

* Deits, C. J., *vice* Warren, S. J.

## BREWER, J.

In this wrongful death action, defendants Pony Express Courier Corporation (Pony Express) and William S. Colton appeal a judgment entered after a jury returned a verdict for plaintiff, the personal representative of the estate of decedent Corinne Tabert. Tabert died, and her seven-year-old daughter was severely injured, as a result of being struck by a delivery van owned by Pony Express and driven by Colton. Defendants admitted fault, and the case was tried as to damages only. The jury awarded plaintiff economic damages of $56,210 for the loss of Tabert's services to her daughter and $15,613.80 for the loss of Tabert's monetary support of her daughter. It also awarded plaintiff noneconomic damages of $10,000 for Tabert's pain and suffering before her death and $850,000 for the daughter's loss of Tabert's society and companionship. Pursuant to ORS 18.560, imposing a $500,000 limitation on noneconomic damages,[1] the trial court reduced the verdict by $360,000 and entered judgment for plaintiff for $571,822.80 plus costs.

On appeal, defendants argue that the trial court erred in denying their motion to compel production of records of the State Office for Services to Children and Families (SCF), if any, in the possession of plaintiff's legal counsel.[2] Defendants also argue that the court erred in granting plaintiff's motion *in limine* to exclude evidence of or reference to records of the Montana Department of Family Services (DFS). They next argue that the trial court erred in allowing an expert witness to testify as to what another expert told him in an out-of-court conversation. Finally, they argue that

---

[1] In *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), the Oregon Supreme Court determined that, as applied to wrongful death actions, the $500,000 limitation for noneconomic damages does not violate the state or federal constitution.

[2] The records consisted of portions of an SCF file that had been prepared for the purpose of a juvenile court dependency proceeding involving Tabert's daughter following Tabert's death. See ORS 419B.100. The records were provided to the daughter's guardian ad litem in that proceeding. At that time, the guardian ad litem provided them to her counsel, who eventually also became plaintiff's counsel in this case. In this court, as he did below, plaintiff asserts that the record does not establish that he ever saw any of the records or that his counsel used the records in preparing this wrongful death action.

the trial court erred in instructing the jury that the daughter's loss of Tabert's services was an element of plaintiff's economic damages. We affirm.

We begin with defendants' assignment of error relating to SCF records, if any, in the possession of plaintiff's counsel. Before trial, defendants moved to compel production of the records from plaintiff, including information SCF may have received from out-of-state social service agencies, asserting that they contained information about Tabert's marriages, her possible substance abuse problems, and her relationship with her daughter. The trial court denied the motion.

On appeal, defendants contend that the records were relevant to the issue of the relationship between Tabert and her daughter, that they were entitled to discovery of the records under ORCP 36 B(1), that ORS 409.225 did not prohibit their disclosure, and that the trial court's denial of their motion was error requiring reversal.[3] Plaintiff responds that defendants did not preserve the issue for appeal, because they failed to make an offer of proof, because they failed to request *in camera* review of the records, and because, according to plaintiff, they raise new arguments on appeal. On the merits, plaintiff contends that ORS 409.225 prohibits discovery of the records.

■ We first reject plaintiff's argument that defendants failed to preserve this issue because, on appeal, they make new arguments relating to the application of ORS 409.225. At the hearing on defendants' motion to compel production of the records, defendants raised the issue of the disclosability of the records and cited ORCP 36 B(1) and ORS 409.225, among other authorities, for their contentions in that regard. In addition, the parties, as well as a legal representative of SCF, made extensive arguments relating to the proper interpretation and application of the latter statute in this context.[4] That was enough. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (raising an issue at trial is ordinarily

---

[3] The cited statutory provisions are set out in the discussion below.

[4] SCF appeared and argued in response to defendants' motion to compel the production of SCF records in the possession of SCF. The trial court denied that motion as well. Defendants do not assign error to that ruling.

essential, raising the source for that position is less essential, and raising a particular argument is the least essential).

■    We also reject plaintiff's argument that, under *State v. Affeld,* 307 Or 125, 764 P2d 220 (1988), and related cases, defendants did not preserve this issue because they failed to make an "offer of proof" as to the nature of the documents sought. Plaintiff is correct that, under *Affeld,* an offer of proof is required when the trial court excludes evidence, unless the trial court refused to allow the offer of proof to be made. Here, however, the trial court did not exclude evidence; rather, the trial court denied defendants' motion to compel production of documents. Plaintiff's reliance on *Affeld* therefore is misplaced.

That is not to say, however, that, in the context of a motion to compel the production of documents as to which the opposing party has asserted a privilege against discovery, the party seeking production need not make some showing in regard to, and the trial court need not determine, whether the documents are, in fact, subject to discovery. *Frease v. Glazer,* 330 Or 364, 371-74, 4 P3d 56 (2000), is instructive in that regard. In that case, the plaintiff moved to compel production of the defendant attorney's files relating to his representation of a client. As pertinent here, the defendant opposed production on the ground that the files were subject to the attorney-client privilege, OEC 503. In turn, the plaintiff asserted that the files nevertheless were discoverable, because they were subject to the crime-fraud exception to that privilege, OEC 503(4)(a). The trial court ordered the defendant to turn over his files for *in camera* review for the purpose of determining whether any of the documents was subject to the crime-fraud exception. The defendant initiated a mandamus proceeding, seeking a directive that the court vacate its order. *Id.* at 368-69.

The Supreme Court first noted that "[t]he attorney-client privilege is one of the oldest and most widely recognized evidentiary privileges" and that "the parties [did] not dispute the existence of" that privilege. *Id.* at 370-71. The court also noted that neither the evidence code nor the court's previous jurisprudence established the "appropriate legal standard for a trial court to apply" in ordering *in camera*

review of documents for the purpose of determining the applicability of that privilege. *Id.* at 372. Adopting the approach set out in *United States v. Zolin*, 491 US 554, 109 S Ct 2619, 105 L Ed 2d 469 (1989), the court concluded that,

> " 'before a trial court may engage in *in camera* review at the request of the party opposing the attorney-client privilege on the basis of the crime-fraud exception, that party must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability.' " *Frease*, 330 Or at 372 (quoting *Zolin*, 491 US at 574-75).

The court also explained that, on appeal, the trial court's determination whether the party's showing was sufficient is reviewable for legal error. *Id.* at 373-74.

■ ■ Viewed in the abstract, the principle applied in *Frease*, although applied in a novel context in that case, was the well-established one that the proponent of a particular position or result has the burden of demonstrating the existence of a basis for that position or result. *See, e.g., State v. Cunningham*, 164 Or App 680, 688, 995 P2d 561, *rev den* 331 Or 283 (2000) (noting "the legal proposition that a proponent of a request to the court has the burden of demonstrating *prima facie* grounds for the relief requested"); *State v. Arellano*, 149 Or App 86, 90, 941 P2d 1089 (1997), *rev dismissed as improvidently allowed* 327 Or 555 (1998) (in an OEC 104 hearing, the proponent of evidence generally has the burden of establishing the factual prerequisites for admissibility). Accordingly, although the parties and the trial court in this case did not have the benefit of the Supreme Court's analysis in *Frease,* it is appropriate to apply that principle here. In addition, we note that the principle properly is applicable not only to a factual assertion that documents are subject to an exception to an asserted privilege but also to a factual assertion that documents do not, in the first instance, fall within the scope of the privilege. In either circumstance, it is incumbent on the party seeking disclosure to present to the trial court "sufficient evidence" of that fact. Again, on appeal, we review the trial court's determination regarding the sufficiency of the factual showing for legal error.

Before applying that standard here, however, we must first consider a threshold question: whether, as a matter of law, there exists a privilege against discovery of SCF records under ORS 409.225 or any other statute. If there does not, the records in this case were presumptively discoverable. If, by contrast, there exists a privilege against discovery under ORCP 36 B(1) that is applicable to any or all of the records at issue in this case, it was then, and only then, incumbent upon defendants to "present sufficient evidence to support a reasonable belief" that some or all of the records nevertheless were subject to discovery.

Again, in the hearing on defendants' motion to compel production of the SCF records in the possession of plaintiff's counsel, plaintiff argued that, under ORS 409.225, the records were not subject to disclosure. SCF also argued that ORS 409.225 prohibited disclosure of the records and, in addition, argued that the records were not subject to "any kind of balancing test." Defendants argued that ORS 409.225 did not preclude discovery. The court denied the motion to compel production of the documents. Although it did not state its grounds for denying the motion, the court made no findings indicating that it did so pursuant to an exercise of its discretion under ORCP 36 C, providing for denial of discovery upon a showing that justice so requires "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Under the described circumstances, we treat the trial court's order denying production of the SCF records in the possession of plaintiff's counsel as a determination that, as a matter of law, the records were privileged under ORS 409.225 against discovery.

In this court, defendants argue that ORS 409.225 does not create a privilege against discovery of the records, because subsection (1) of ORS 409.225 only prohibits disclosure of SCF records *by SCF*, not by other persons who have come into possession of the records. They also contend that ORS 409.225(1) constitutes a prohibition on voluntary disclosure but does not prohibit court-ordered disclosure. Defendants argue that, after the records were disclosed by SCF to Tabert's daughter's guardian ad litem pursuant to subsections (2) and (3) of ORS 409.225, and after the guardian ad litem disclosed them to her counsel, who was also plaintiff's

counsel, plaintiff's counsel was authorized or required to disclose them to defendants under ORS 409.225(4) and case law relating to discovery in criminal cases. Plaintiff responds that the records are not discoverable because ORS 409.225 provides that SCF records are confidential and not subject to public inspection; because, under that statute, defendants are not among the entities to whom, and this litigation is not among the purposes for which, disclosure is authorized; and because, although the daughter's guardian ad litem was authorized to receive the records, ORS 409.225(4) prohibited redisclosure of the records.

We determine the legislature's intended meaning of a statute by applying the familiar analytic framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We first examine the text and context of the statute. The text of a statutory provision is the best evidence of the legislature's intent and provides the starting point for interpretation. *Id.* As part of the text, the court considers prior cases interpreting the statute. *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992) (when the Supreme Court interprets a statute, that interpretation becomes a part of the statute as if written into it at the time of its enactment). The context of a statute includes other provisions of the same statute and other related statutes. If the legislature's intent is clear from the court's inquiry into those factors, further inquiry is unnecessary. *PGE*, 317 Or at 611.

ORCP 36 B(1) provides:

"For all forms of discovery, parties may inquire regarding *any matter, not privileged*, which is relevant to the claim or defense of the party seeking discovery * * * including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things, and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." (Emphasis added.)

By its terms, ORCP 36 B(1) provides for the discovery of "any matter, not privileged." For the purpose of ORCP 36 B(1), a

privilege includes those privileges set out in the evidence code and other privileges created by the state or federal constitution, by statute, or by the courts. *See* OEC 514 (unless expressly repealed, all existing constitutional, statutory and judicially developed privileges are recognized and continue to exist); *see also John Deere v. Epstein*, 307 Or 348, 354, 769 P2d 766 (1989) (the word "privilege" is not qualified in the evidence code; it therefore includes all privileges, including those not enumerated in the code).

ORS 409.225 provides, in part:

"(1)   In the interest of family privacy and for the protection of children, families and other recipients of services, *the State Office for Services to Children and Families shall not disclose or use the contents of any records, files, papers or communications that contain any information about an individual child, family or other recipient of services for purposes other than those directly connected with the administration of child welfare laws or unless required or authorized by ORS 419A.255 or ORS 419B.035. The records, files, papers and communications are confidential and are not available for public inspection.* General information, policy statements, statistical reports or similar compilations of data are not confidential unless such information is identified with an individual child, family or other recipient of services or protected by other provision of law.

"(2)   Notwithstanding subsection (1) of this section, unless exempt from disclosure under ORS chapter 192, *the State Office for Services to Children and Families shall disclose records*:

"(a)   About a recipient of services, to the recipient if the recipient is 18 years of age or older or is legally emancipated, unless prohibited by court order;

"(b)   Regarding a specific individual if the individual gives written authorization to release confidential information;

"(c)   Concerning a child receiving services on a voluntary basis, to the child's parent or legal guardian;

"(d)   To the juvenile court in proceedings regarding the child; and

"(e)    Concerning a child who is or has been in the custody of the State Office for Services to Children and Families, to the child's parent or legal guardian except:

"(A)    When the child objects; or

"(B)    If disclosure would be contrary to the best interests of any child or could be harmful to the person caring for the child.

"(3)    Notwithstanding subsection (1) of this section, unless exempt from disclosure under ORS chapter 192, *the State Office for Services to Children and Families shall disclose records*, if in the best interests of the child, to:

"(a)    Employees of the Department of Human Services to the extent necessary to perform their official duties or to provide services to the child or family;

"(b)    Treatment providers, foster parents, adoptive parents, school officials or other persons providing services to the child or family to the extent that such disclosure is necessary to provide services to the child or family; or

"(c)    A person designated as a member of a sensitive review committee convened by the Director of the State Office for Services to Children and Families when the purpose of the committee is to determine whether the State Office for Services to Children and Families acted appropriately and to make recommendations to the State Office for Services to Children and Families regarding policy and practice.

"(4)    Any record disclosed under subsection (1), (2) or (3) of this section shall be kept confidential by the person or entity to whom the record is disclosed and *shall be used only for the purpose for which disclosure was made*." (Emphasis added.)

By its terms, ORS 409.225 applies to "records, files, papers or communications that contain any information about an individual child, family or other recipient of services." ORS 409.225(1).[5] Under the second sentence of subsection (1), such records generally are "confidential and not

---

[5] ORS chapter 409 does not specify the meaning of the term "child." For the purposes of related ORS chapters 419B and 419C, a "child" is "a person within the jurisdiction of the juvenile court as provided in ORS 419B.100," relating to dependency proceedings. ORS 419A.004(2). We apply that definition to ORS 409.225 as well.

available for public inspection." That directive is supplemented by, and an exception is provided in, the first sentence of subsection (1), which expressly prohibits *SCF* from disclosing or using such records, *except* "for purposes * * * directly connected with the administration of child welfare laws or unless required or authorized by ORS 419A.255 or ORS 419B.035." Additional exceptions to the general confidentiality directive set out in subsection (1) are set out in subsections (2) and (3); however, like the exceptions in subsection (1) for disclosures "connected with the administration of child welfare laws" and for disclosures "required or authorized by ORS 419A.255 or 419B.035," those exceptions apply only to disclosure in various specified circumstances *by SCF*. Finally, under subsection (4), a record that is disclosed by SCF pursuant to subsection (1), (2), or (3) of ORS 409.225 must be "kept confidential by the person or entity to whom the record is disclosed and shall be used only for the purpose for which disclosure was made."

The text of ORS 409.225 plainly and unambiguously provides that SCF records containing "information about an individual child, family or other recipient of services" are "confidential and not subject to public inspection." In addition, none of the exceptions in subsections (1), (2), (3), or (4) to that confidentiality was applicable to disclosure of the records by Tabert's daughter's guardian ad litem's counsel to plaintiff's counsel for the purpose of this wrongful death action. Finally, even assuming that the records nevertheless were or could be deemed to be in the possession of plaintiff's counsel, none of those exceptions authorized further disclosure of the records by plaintiff's counsel to defendants. In short, nothing in ORS 409.225 authorized *disclosure under that statute* of SCF records by plaintiff's counsel to defendants.

The fact that the records were confidential and not disclosable under ORS 409.225 does not, however, necessarily mean that they were privileged against discovery under ORCP 36 B(1). *See Premier Technology v. Oregon State Lottery*, 136 Or App 124, 133-35, 901 P2d 883 (1995) (the fact that the information at issue in that case was exempt from disclosure under the Public Records Law did not necessarily mean that it was privileged and not discoverable under

ORCP 36 B); *see also* Laird C. Kirkpatrick, *Oregon Evidence*, 293 (3d ed 1996) (in addition to the privileges set out in the evidence code, other statutes "make certain communications or records immune from judicially compelled disclosure" and still other statutes "designate certain information as *confidential* * * * without stating that such information is immune from judicially compelled disclosure" (emphasis added)). As the evidence code provisions relating to privilege make clear, the legislature knows how expressly to provide that records or other communications are "privileged." The fact that ORS 409.225 provides for confidentiality and non-disclosure of SCF records without expressly providing that they are "privileged" suggests that the legislature did not intend for them to be privileged against discovery under ORCP 36 B.[6]

We also consider two related statutes expressly referred to in ORS 409.225. In contrast to that statute, which establishes requirements relating to disclosure of SCF records *by SCF*, the first of the related statutes, ORS 419A.255, establishes requirements for the disclosure of juvenile records generally. The second, ORS 419B.035, establishes requirements for the confidentiality of child abuse reporting records. ORS 419A.255 (1997)[7] provided, in part:

> "(1)  The clerk of the court shall keep a record of each case, including therein the summons and other process, the petition and all other papers in the nature of pleadings, motions, orders of the court and other papers filed with the court, but *excluding reports and other material relating to the child's or youth's history and prognosis*. The record of the case shall be withheld from public inspection but shall be open to inspection by the child or youth, parent, guardian, court appointed special advocate, surrogate or a person allowed to intervene in a proceeding involving the child or youth under ORS 109.119 (1), and their attorneys. The attorneys are entitled to copies of the record of the case.

---

[6] Nor is it significant that SCF records generally are public records, testimony regarding which is subject to the public officer privilege, OEC 509. Defendants were not seeking to examine a public officer but sought disclosure of the records themselves. *See State ex rel SOSCF v. Williams*, 168 Or App 538, 548, 7 P3d 655 (2000).

[7] ORS 419A.255 was amended in 1999; the amendments are not material here.

"(2) *Reports and other material relating to the child's* or youth's *history and prognosis are privileged* and, except at the request of the child or youth, shall not be disclosed directly or indirectly to anyone other than the judge of the juvenile court, those acting under the judge's direction, service providers in the case and the attorneys of record for the child or youth or the child's or youth's parent, guardian, court appointed special advocate, surrogate or person allowed to intervene in a proceeding involving the child or youth under ORS 109.119 (1). Reports and other material relating to a youth offender's history and prognosis in cases under ORS 419C.005 may be disclosed to law enforcement agencies. The service providers in the case, school superintendents and attorneys are entitled to examine and obtain copies of any reports or other material relating to the child's or youth's history and prognosis. Any service provider in the case, school superintendent or attorney who examines or obtains copies of such reports or materials is responsible for preserving their confidentiality and shall return the copies to the court upon the conclusion of the service provider's, superintendent's or attorney's involvement in the case.

"(3) Except as otherwise provided in subsection (7) of this section, *no information appearing* in the record of the case or *in reports or other material relating to the child's or youth's history or prognosis may be disclosed to any person not described in subsection (2) of this section without the consent of the court,* except for purposes of evaluating the child's or youth's eligibility for special education as provided in ORS chapter 343, and no such information may be used in evidence in any proceeding to establish criminal or civil liability against the child or youth, whether such proceeding occurs after the child or youth has reached 18 years of age or otherwise, except for the following purposes:

"(a) In connection with a presentence investigation after the guilt of the youth has been admitted or established in a criminal court.

"(b) In connection with a proceeding in another juvenile court concerning the child or youth or an appeal from the juvenile court."[8] (Emphasis added.)

---

[8] A "youth" is a person under age 18 who is alleged to have committed a law violation. ORS 419A.004(31). A "youth offender" is a person found to be within the jurisdiction of the juvenile court under ORS 419C.005 for an act committed when

By its terms, ORS 419A.255(2) expressly provides for disclosure of a particular category of records relating to a "child"—namely, "reports and other material relating to the child's * * * history and prognosis"—to specified entities or upon "request of the child" or "consent of the court." Except for those authorized forms of disclosure, the statute expressly provides that records in that category are "privileged." Neither ORS 419A.255(2) nor any other statute defines the terms "history" and "prognosis." We accord them their plain meanings. *See Webster's Third New Int'l Dictionary*, 888, 1073-74, 1812 (unabridged ed 1993) (defining "forecast" as "a prophecy, estimate, or prediction of a future happening or condition"; defining "history" as "a narrative of events connected with a * * * person" and "an account of a sick person's family and personal background, his past health, and present illness"; defining "prognosis" as "the prospect of survival and recovery from disease"). By its terms, then, ORS 419A.255(2) provides that records relating to a child's medical, psychological, and social—that is, personal and family—background and predicted future condition or status are "privileged." *See also* ORS 419B.325 (for purpose of determining the proper disposition of a child, the juvenile court in a dependency proceeding may receive "testimony, reports or other material relating to the child's mental, physical and social history and prognosis"); *cf. State ex rel Juv. Dept. v. S.*, 14 Or App 263, 511 P2d 878 (1973) (noting that, in the delinquency adjudication in that case, the juvenile court had considered "medical, psychological, and social reports relating to the [youth's] history and prognosis").

We understand the term "privileged" in ORS 419A.255(2) to have the same meaning as that term in ORCP 36 B(1). *See PGE*, 317 Or at 611 (where the legislature uses the same term in related statutes, court infers that the term has same meaning). Moreover, even assuming that the privilege is qualified by the exceptions provided in ORS 419A.255(2) and (3), by their terms, none of those exceptions was applicable here. Accordingly, we conclude that records—including SCF records—containing information about a

the person was at least 12 years of age and under 18 years of age. ORS 419A.004(33).

child's medical, psychological, and personal and family background and predicted future condition or status were privileged against discovery by defendants in this case. Conversely, the legislature's use of the term "privileged" in ORS 419A.255(2) and its omission of that term from ORS 409.225 is additional evidence that SCF records—unless they are also records "relating to [a] child's * * * history and prognosis"—are not privileged within the meaning of ORCP 36 B(1). *See id.* (use of a term in one provision and not in another indicates a deliberate omission).

■    Because of the express reference to it in ORS 409.225, we also consider ORS 419B.035(1), which provides, in part:

> "Notwithstanding the provisions of [ORS chapter 192] relating to confidentiality and accessibility for public inspection of public records and public documents, reports and records compiled under the provisions of ORS 419B.010 to 419B.050 [the child abuse reporting law] are confidential and are not accessible for public inspection."

By its terms, ORS 419B.035 provides that child abuse reporting records are "confidential and * * * not accessible for public inspection." ORS 419B.035 also authorizes SCF to disclose child abuse reporting records in specified circumstances, none of which applies to defendants in this case. However, like SCF records under ORS 409.225, child abuse reporting records are not expressly denominated as "privileged." We therefore conclude that, like SCF records under ORS 409.225, such records are privileged only if they are also records "relating to a child's * * * history and prognosis" within the meaning of ORS 419A.255(2).

■    We are mindful of the principle that "[e]videntiary privileges in litigation are not favored." *Herbert v. Lando*, 441 US 153, 99 S Ct 1635, 60 L Ed 2d 115 (1979); *see also Univ. of Pennsylvania v. EEOC*, 493 US 182, 110 S Ct 577, 107 L Ed 2d 571 (1990) (declining to adopt, under FRE 501, which provides that privileges are governed in part by the common law, a "peer-review" privilege; noting that testimonial privileges contravene the fundamental principle that "the public * * * has a right to every man's evidence" and that such privileges are to be "strictly construed"); *United States v. Nixon*, 418 US

683, 94 S Ct 3090, 41 L Ed 2d 1039 (1974) (noting that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed"). Nevertheless, based on the plain meanings of the relevant statutes, it is apparent to us that the legislature intended to create such a privilege as to at least some juvenile records. Again, under ORS 419A.255(2), SCF records and other records that constitute "reports and other material relating to [a] child's * * * history and prognosis" within the meaning of ORS 419A.255(2) are privileged against discovery under ORCP 36 B(1). However, SCF records within the meaning of ORS 409.225 that are not also records "relating to [a] child's * * * history and prognosis" within the meaning of ORS 419A.255 are confidential but are not privileged against discovery.[9] To the extent that the trial court denied defendants' motion to compel production of the SCF records in the possession of plaintiff's counsel on the ground that all of those records necessarily were privileged by reason of ORS 409.225 against discovery under ORCP 36 B(1), that reasoning was error.

Nevertheless, we can affirm the trial court's denial of the motion if the trial court reached the correct result. *See State ex rel Juv. Dept. v. Pfaff*, 164 Or App 470, 476-77, 994 P2d 147 (1999), *rev den* 331 Or 193 (2000) (explaining "settled rule" that a reviewing court will not disturb a decision of a lower court where the result is correct, even though the lower court relied on a wrong ground or gave a wrong reason; citing cases). We conclude that the trial court reached the right result in this instance because, even if some of the SCF records sought by defendants were discoverable by reason of *not* constituting privileged records "relating to [Tabert's daughter's] history and prognosis," defendants failed to make a sufficient showing in that regard, as required under *Frease*. Again, in the hearing on their motion, defendants asserted that the records they sought contained information about Tabert's marriages, about her possible substance abuse problems, and about her relationship with her daughter, including information SCF may have received from out-of-state social service agencies. As discussed above, we interpret the

---

[9] We state no opinion regarding possible ground on which confidential but not privileged SCF records might be subject to a denial or limitation of discovery under ORCP 36 C or any other statute.

statutory term "reports and other material relating to [a] child's * * * history and prognosis" as applying to records containing information about a child's medical, psychological, and social (including family and personal) background and predicted future condition or status. Defendants' factual assertions in this case regarding the SCF records, if any, in the possession of plaintiff's counsel demonstrated that those records were within the category of records that are privileged under ORS 419A.255(2), rather than the category of records that are merely confidential, and therefore potentially discoverable, under ORS 409.225.[10] Accordingly, defendants' factual showing did not entitle them to production of the privileged records.

■  In summary, to the extent that the trial court denied defendants' motion to compel production on the ground that all SCF records are privileged under ORS 409.225 against discovery under ORCP 36 B(1), the trial court's reasoning was incorrect. Nevertheless, because defendants failed to demonstrate that, as a factual matter, any of the records sought was outside the category of records privileged against discovery under ORS 419A.255(2), the trial court reached the right result, and we affirm its denial of defendants' motion to compel. There was no error.

We turn to defendants' second assignment of error. In that assignment, defendants argue that the trial court erred in granting plaintiff's motion *in limine* to exclude evidence of, or reference to, records of the Montana DFS. The records pertained to that agency's placement of Tabert's daughter in foster care during a period in the early 1990's when Tabert was hospitalized. Defendants initially sought production from plaintiff of both the DFS records and the Montana hospital records. Plaintiff responded that he did not have possession of the DFS records and that, in any event, they were confidential. Defendants then moved for an order

---

[10] We also note that, although the trial court stated during the hearing on defendants' motion to compel that it was "toying with * * * an *in camera* inspection" in the presence of a representative of SCF, in order to "see what materials would be relevant to this case," and that the court "customarily * * * would ask" for "a list of what you want me to look for," defendants did not request that the court carry out those procedures.

compelling plaintiff to execute releases authorizing disclosure of the hospital records and the DFS records. The trial court ordered plaintiff to execute a release pertaining to the Montana hospital records but denied defendants' motion as to the DFS records.[11] Nevertheless, in providing its own records to defendants, the Montana hospital inadvertently also provided the DFS records, which previously had been provided to the hospital by DFS. Legal counsel for Montana DFS immediately contacted the parties and informed them that release of the records "to third parties in connection with the pending civil proceedings was unauthorized and is prohibited by Montana statute" and that there was no "waiver" by Montana DFS of the applicable confidentiality statute.

Plaintiff thereafter filed his motion *in limine* to exclude from evidence the DFS records in defendants' possession and any reference to them. In support of the motion, plaintiff argued that the records were confidential under Montana Code Annotated (MCA) 41-3-205 and that no exception in the statute was applicable. In opposition to the motion, defendants argued that disclosure of the records was authorized under an exception providing for disclosure to the parents or guardians of a child who is the subject of the records and, further, that the court had authority under another statutory exception to order the public disclosure of the records at trial. Plaintiff replied that, because defendants were not authorized to possess the records and the lawful custodian of the records, Montana DFS, was not before the court, the court should exclude the records from evidence. Finally, plaintiff argued that, even assuming that under the statutory exception defendants relied on, "a court" could order Montana DFS to provide the records for *in camera* inspection, the term "court" referred only to juvenile courts and did not include courts of general civil jurisdiction.

The trial court granted plaintiff's motion *in limine* to exclude the records. In its ruling, the court stated that it was

"going to rule that the [DFS] report in its entirety as submitted through the hospital is confidential, that it could not have been obtained by a subpoena to the Montana DFS.

---

[11] Defendants have not assigned error to that ruling.

That the production and inspection provisions of [MCA 41-3-205] relate to juvenile court proceedings only and that they are not available in a civil case merely based on the fact that a plaintiff is making a claim, and the DFS records arguably have information relevant to that claim."

In this court, as below, defendants concede that the records were confidential. They also abandon their argument that the records were admissible because they were authorized to obtain disclosure of the records under the statutory exception providing for disclosure to the parents or guardians of a child who is the subject of the records. Instead, defendants argue that the trial court erred in excluding the records because the statutory exception providing for *in camera* inspection by the court, MCA 41-3-205(2), was not limited to juvenile court proceedings and that the trial court therefore had discretion to review the records *in camera* to determine whether they were relevant and had discretion to allow further "public disclosure" at trial. Defendants also argue that, under *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987), the trial court erred in failing to exercise that discretion and that the court's error was not harmless. Plaintiff responds that the trial court had discretion to exclude the records, because they were confidential and were obtained through inadvertent or unauthorized discovery. Plaintiff also argues that the trial court correctly concluded that the Montana statutory exception applies only in regard to Montana juvenile court proceedings and that, in any event, defendants failed to lay a foundation for the admissibility of the records, which, plaintiff asserts, are "rife" with hearsay. Finally, plaintiff argues that even if the trial court erred in excluding the records, that error was harmless.

▇▇▇▇ We review a trial court's order excluding evidence for errors of law and abuse of discretion as appropriate. *See State v. Rogers,* 330 Or 282, 310-12, 4 P3d 1261 (2000) (explaining that a trial court's admission or exclusion of evidence "may involve both the application of legal rules and the exercise of discretion"; where there is only one legally correct outcome as to the admissibility of the evidence, the exercise of discretion is not warranted, whereas "if the application of a legal rule governing the admissibility of evidence allows for several legally correct outcomes, a trial court may exercise discretion

to choose among those outcomes"). We begin by examining the statutory framework under which the trial court made its ruling, including decisions of the Montana appellate courts interpreting and applying the statute. If we identify no Montana decision regarding an aspect of the statute that is significant here, we determine the proper meaning and application of that portion of the statute in accordance with Montana's general rules of statutory construction. *See Peterson v. Ely*, 279 Or 581, 569 P2d 1059 (1977) (Oregon Supreme Court construed Washington statute in accordance with decisions of Washington Supreme Court). In construing a statute, a Montana appellate court attempts to discern the intent of the legislature, starting with the text of the statute "if the words are clear and plain." *S.L.H. v. State Compensation Mutual Insurance Fund*, ____ Mont ____, 15 P3d 948 (2000). In order to give effect to the purpose of the statute and avoid an absurd result, the court considers the statute as a whole. If the legislature's intent cannot be discerned from the language of the statute, the court considers its legislative history. *Skinner Enterprises, Inc. v. Board of Health*, 286 Mont 256, 950 P2d 733 (1997).

Title 41, chapter 3, of the Montana Code Annotated (MCA) pertained to child abuse and neglect.[12] Part 2 of that chapter pertained to "reports and investigations" of child abuse and neglect. As pertinent here, MCA 41-3-201 listed the categories of persons required to report known or suspected child abuse or neglect and the required contents of the reports. MCA 41-3-202 set out the duties of particular entities upon receipt of such reports, including the duty to investigate the report, to assess and plan for the family, to provide protective services for the child, and other duties. The entities on whom the duties were imposed included the Department of Public Health and Human Services, local affiliates of the department, county attorneys, and peace officers. MCA 41-3-205 provided, in part:

> "(1) The case records of the department of public health and human services and its local affiliate, the county welfare department, the county attorney, and the court concerning actions taken under this chapter and all records

---

[12] All citations are to the 1997 version of the statute.

concerning reports of child abuse and neglect *must be kept confidential* except as provided by this section. Except as provided in subsection (4) and (5) [relating in part to dissemination of information by family members and news organizations], a person who permits or encourages the unauthorized dissemination of the contents of case records is guilty of a misdemeanor.

"(2) Records *may be disclosed* to a court for in camera inspection if relevant to an issue before it. The court may permit public disclosure if it finds disclosure to be necessary for the fair resolution of an issue before it." (Emphasis added.)

Subsection (3) provided that such records "may also be disclosed" to specified persons and entities "in this state and any other state or country."[13] Subsection (4) of MCA 41-3-205 provided:

"A person who is authorized to receive records under this section shall maintain the confidentiality of the records and may not disclose information in the records to anyone other than the persons described in subsection (3)(a). However, this subsection may not be construed to compel a family member to keep the proceedings confidential."

Three relevant conclusions flow readily from an examination of the statute. First, defendants do not fall within any of the classes of persons or entities to whom DFS records may be disclosed under subsection (3). Second, subsection (4) prohibited the Montana hospital from further disclosing the DFS records to defendants. Third, it follows that defendants were not entitled to possession of the records they held when plaintiff filed his motion *in limine*. We next consider whether, in light of the foregoing, the trial court was

---

[13] The persons and entities to which the records may be disclosed under subsection (3) include entities legally authorized to receive, inspect and investigate reports of child abuse or neglect, MCA 41-3-205(3)(a); licensed youth-care or child-placing agencies, MCA 41-3-205(3)(b); a health or mental health professional who is treating the family or child who is the subject of the report, MCA 41-3-205(3)(c); a parent, guardian, or person designated by a parent or guardian of a child who is the subject of the records, MCA 41-3-205(3)(d); a child named in the records or the child's legal guardian or representative, MCA 41-3-205(3)(e); the state protection and advocacy program authorized under federal law, MCA 41-3-205(3)(f); approved foster or adoptive parents, MCA 41-3-205(3)(g); and numerous other persons and entities who are not pertinent to the present inquiry.

required to inspect and, if otherwise appropriate, permit public disclosure of the DFS records at trial, as provided in subsection (2).

We assume without deciding that defendants are correct in asserting that the trial court erred in concluding that the records were disclosable only in juvenile courts. Montana case law applying MCA 41-3-205 suggests that disclosure of DFS records under subsection (2) of the statute is not limited to disclosure in and to juvenile courts. Rather, it appears that DFS records may also be reviewed *in camera* under subsection (2) in criminal cases, *see, e.g., State v. Little*, 260 Mont 460, 861 P2d 154 (1993), as well as in Montana proceedings to terminate a parent's rights, *see, e.g., In re M.A.W.*, 256 Mont 296, 846 P2d 985 (1993).

In *In re M.A.W.*, the Montana Supreme Court stated that, pursuant to MCA 41-3-205(2), a trial court has discretion whether to conduct an *in camera* inspection of records made confidential under that statute. *See id.*, 846 P2d at 995. ("Under [MCA 41-3-205(2),] the District Court is given the discretion to determine if the evidence is relevant to an issue before it. It is given the discretion as to whether to conduct the 'in camera' examination at all."). However, we have not found a Montana decision relating to a trial court's authority or obligation to exercise discretion under MCA 41-3-205(2) under the present circumstances, in which the party seeking public disclosure of the records obtained them through unauthorized disclosure. Plaintiff argues that the records could be disclosed only to *and* by persons and entities entitled to receive and possess them. Because defendants were not authorized to receive or possess the records, plaintiff argues that defendants were not, in turn, authorized to disclose the records to the court and to the public at trial under subsection (2). According to plaintiffs, no other construction of the statute makes sense because, otherwise, anyone who has received DFS records through improper means could seek public disclosure of the records through a court without providing an opportunity for the lawful custodian of the records to defend their confidentiality. At the least, plaintiff contends that the court had discretion to decide whether the records could be used at trial and that the court did not abuse its discretion.

Interestingly, defendants have virtually ignored the foregoing arguments, except to urge that plaintiff has gotten the standard of review wrong. Defendants argue that the court erred as a matter of law in concluding that subsection (2) authorized disclosure of confidential records only to a *juvenile* court. Defendants contend that, because of that error, the court failed to recognize and exercise its discretion to review the records and, if appropriate, to order their disclosure to the jury in this case. *See Mayfield*, 302 Or at 645. In short, defendants contend that the trial court's error was legal and did not involve the exercise of discretion. Because of the way defendants have framed their argument, its validity depends entirely upon the accuracy of defendants' characterization of the trial court's decision. Defendants' argument might have merit if we were able to say that the court's ruling was based exclusively on its arguably erroneous construction of subsection (2). However, it was not.

The trial court decided plaintiff's motion *in limine* on the record, ruling from the bench following an oral argument that was interspersed with extensive colloquy between the court and counsel. In announcing its ruling, the court did not articulate its reasoning at length. However, it is clear that the court intended to provide multiple grounds for its decision. Defendants focus on only one of those grounds. In doing so, they overlook the court's statement "that the [DFS] report in its entirety *as submitted through the hospital* is confidential, that it could not have been obtained by a subpoena to the Montana DFS." (Emphasis added.) That statement is logically unrelated to the court's subsequent conclusion that subsection (2) applied only to juvenile court proceedings. If the court had intended to base its decision solely on its determination that defendants could disclose the DFS records only to a juvenile court, it would have had no reason to make the additional statement quoted above. That statement was, however, made for reasons that are more fully apparent in the context of the colloquy between the court and counsel during argument on the motion *in limine*.

In arguing the motion, plaintiff's attorney urged that "DFS gets to state a position and they get to argue to the judge why their records should or should not be disclosed. An that's the procedure and that's not what we have here.

These records did not come to this court from DFS." The court and plaintiff's counsel then engaged in an extended discussion about whether DFS would be required to disclose the records to a court under subpoena. The court stated that it "would say * * * you have to deliver it to the court under, under subsection 2." The court admonished plaintiff's attorney not to "tell me Montana is not here. *We'll go to that in the next step*." (Emphasis added.) The court then stated:

> "Assume we're in Montana and DFS is standing there with this stack of records and you're, you're standing up as the lawyer and saying 'we're not going to turn them over to you for in camera inspection.' And I cite this statute to you. Why wouldn't you have to turn them over for *in camera* inspection?"

After further discussion, plaintiff's attorney acknowledged that if "the Montana court or judge ordered DFS to produce them to it for its *in camera* inspection, that they would be obliged to do so." With the foregoing colloquy in mind, we return to the trial court's ruling.

■       The trial court record regarding a discretionary ruling must adequately reflect an exercise of discretion. *Lutz v. State of Oregon*, 130 Or App 278, 283, 881 P2d 171 (1994). The court's consideration of a discretionary decision need not be lengthy or complex, but it must indicate why the court took the action it did. *See Antunez v. Lampert*, 169 Or App 196, 200, 7 P3d 735, *rev den* 331 Or 853 (2000) (Wollheim, J., concurring). Here, although the trial court's explanation of its ruling was brief, it was not inscrutable. The court pointedly stated that the DFS records were confidential "as submitted through the hospital." The court then opined that the records could not have been obtained by subpoena "to the Montana DFS."[14] It is clear from its preceding colloquy with counsel that the court knew that the DFS records had been released improperly by the Montana hospital to defendants and, thus, that defendants were not entitled to possession of

---

[14] As noted, defendants have not appealed from the trial court's order denying their motion to compel production of the DFS records through plaintiff. Defendants did not contend, either before the trial court or on appeal, that they were entitled to subpoena the records *directly* from Montana DFS. Nor is there any evidence that they ever attempted to do so. We express no view concerning the accuracy of the court's opinion concerning that issue.

the records under the circumstances. The court also knew that Montana DFS—the lawful custodian of the records—insisted that its records remained confidential despite their unauthorized release to defendants. Moreover, the court knew that defendants' motion to compel production of the records through plaintiff had been unsuccessful and that defendants had not attempted to make Montana DFS a party to the dispute over the use of the records at trial. The court's focus on those facts is evident in its exchange with counsel during the colloquy and, later, in the ruling itself. The court reasonably concluded that, under such circumstances as these, where defendants were not entitled to possession of the records in the first instance, it was inappropriate to permit defendants to use the DFS records at trial. That exercise of discretion was justified without regard to the soundness of the court's additional statutory rationale for excluding the records. The court did not abuse its discretion by excluding the Montana DFS records from evidence.

In their third assignment of error, defendants contend that the trial court erred in allowing an expert witness, a psychologist, to testify as to what another expert, Tabert's family physician, Dr. Cristol, told him in an out-of-court conversation about the relationship between Tabert and her daughter and about Tabert's "functioning." Defendants contend that the information exceeded the scope of testimony permitted by OEC 703, that it was hearsay under OEC 801(3), that it therefore was inadmissible under OEC 802, and that admission of the evidence was not harmless, because Tabert's ability to function as a parent to her daughter was an important issue in the case. Plaintiff responds that the testimony was admissible under OEC 703 and that, even if it was not, any error in admitting it was harmless.

OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

The legislative commentary to the rule explains that it permits an expert to base an opinion on any of three sources: the expert's personal observation; the testimony of other witnesses at trial; and, at issue here, "data that have been made known to the expert outside of court and other than by the expert's own perception." Kirkpatrick, *Oregon Evidence* at 442. In regard to the described third basis of an expert's opinion, this court has explained that, although an expert may *base* his or her opinion on inadmissible facts and data of the type reasonably relied on by experts in a particular field, "[n]othing in OEC 703 suggests that otherwise inadmissible evidence is admissible simply because it was the basis for the expert's opinion." *Stevens v. Horton*, 161 Or App 454, 465, 984 P2d 868 (1999); *see also State v. Knepper*, 62 Or App 623, 661 P2d 560 (1983) (although OEC 703 permits an expert to give an opinion based on information that is itself inadmissible, it did not permit the expert to state the results of an excludable blood-alcohol test that formed the basis of the expert's opinion regarding the defendant's condition). In particular, although OEC 703 "recognize[s] that experts often rely on facts and data supplied by third parties," the rule "does not give *carte blanche* to admitting otherwise inadmissible hearsay." *Mission Ins. Co. v. Wallace Security Agy., Inc.*, 84 Or App 525, 528-29, 734 P2d 405 (1987); *cf. Jefferis v. Marzano*, 298 Or 782, 794, 696 P2d 1087 (1985) (where the challenged testimony did not include any oral or written out-of-court statement offered to prove the truth of the matter asserted, the trial court did not err in admitting the testimony).

In this case, on direct examination, the psychologist, Dr. Scherr, testified that, in forming his opinions about the relationship between Tabert and her daughter and about Tabert's functioning as a parent, he relied in part on information he received from Cristol. Over defendant's objection, Scherr testified:

> "What [Cristol] shared with me about those two issues was that she thought, she was concerned at times about Ms. Tabert's coping skills, but always saw her and saw that the child saw her mother was a nurturing person who was reliable in terms of, who the child could rely on for nurturance, emotional nurturance and other forms of nurturance.

> She shared that with me, and also that it was her impression that she was willing to learn about parenting and, which was one of the things that [Cristol] recommended."

Although couched in terms of "shar[ing]," that testimony in effect included out-of-court statements of Cristol, to the effect that Tabert was a nurturing parent who, moreover, was willing to learn about parenting, which statements apparently were offered for the truth of the matter asserted.

■   Although the testimony therefore constituted inadmissible hearsay, admission of the evidence was not error requiring reversal. OEC 103(1) provides, in part, that "[e]vidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" *See also* ORS 19.415 (on appeal, no judgment shall be reversed or modified except for error substantially affecting the rights of a party); *Faro v. Highway Division*, 326 Or 317, 323, 951 P2d 716 (1998) (test for harmless error in a civil case is whether the trial court's erroneous ruling substantially affected a right of the party claiming the error).

Scherr's testimony—that Cristol had "shared" that she regarded Tabert as a nurturing parent who was willing to learn about parenting—did not affect a substantial right of defendants, because there was abundant other evidence in the record to the same effect as the challenged evidence. Scherr testified without objection on redirect examination that, based on the records he had reviewed, he believed that Tabert "was a capable, concerned, nurturing parent." A licensed clinical social worker, Hershey, testified that, after Tabert's death, she assisted in preparing the daughter for foster placement, that the daughter had characteristics of a "securely-attached child," that a child becomes securely attached by having a "consistent caregiver over time consistently meeting your needs," and that Tabert had been the daughter's caretaker. Hershey also testified that she had determined that Tabert had provided the daughter with love, affection, guidance, moral training, and education. The daughter's former kindergarten teacher, Rovello, testified that Tabert had accompanied her daughter to and from school every day, that she had attended and participated in

school functions, that the daughter had appeared clean, neatly and appropriately dressed, and well fed, and that "[i]t was a very caring interaction between the mother and child." Tabert's sister, Hauptman, testified that, to her knowledge, Tabert was a "good, nurturing parent" who was "always loving and caring and nurturing," who provided her daughter with "good guidance" and "gave her lots of attention." Davidson, the former foster parent of Tabert's estranged husband, testified that Tabert's daughter "always came first" with Tabert and that Tabert was an "excellent" and "exceptional" mother. Tabert's landlord at the time of her death, Shore, testified that Tabert appeared devoted to her daughter and that her daughter "was her first and only consideration above herself"; that the daughter was always dressed appropriately; and that Tabert and her daughter were "very close." Defendants' own witness, Cushman, who was an acquaintance of Tabert and with whom Tabert and her daughter had stayed for three weeks shortly before Tabert's death, testified consistently with the described testimony, agreeing on cross-examination that Tabert and her daughter had a "very close relationship" and a "very special bond" and that Tabert provided her daughter with "everything [she] needed." When asked whether Tabert was "a very good mom" to her daughter, Cushman responded, "I, I think so."[15]

We recognize that Cristol was a medical doctor whose opinion about Tabert's relationship with her daughter and her capabilities as a parent may have been given substantial weight by the trier of fact. *Cf. State v. Keller*, 315 Or 273, 286, 844 P2d 195 (1993) (in criminal case, admission of testimony was error requiring reversal; witness was a medical doctor with extensive professional experience regarding the relevant issue, who moreover testified "in an authoritative and detailed manner" about that issue, and whose testimony therefore "presumably was persuasive to the trier of fact"). Nevertheless, in light of other evidence regarding

---

[15] Defendants' other witness, a licensed psychologist who reviewed records relating to Tabert and her daughter, opined that, although Tabert was "loving" and was "motivated to be a good mother," her lack of stability and her mental problems "made it difficult for her to do all the aspects of parenting."

Tabert's relationship with her daughter and her "functioning" as a parent—including other testimony by Scherr himself and testimony by other professionals, including a licensed clinical social worker and a teacher—admission of the testimony regarding Cristol's opinion does not require reversal.

■ Finally, in their fourth assignment of error, defendants contend that the trial court erred in instructing the jury that damages for the daughter's loss of Tabert's services constituted economic, rather than noneconomic, damages, and thus were not subject to the limitation, under ORS 18.560(1), of $500,000 for noneconomic damages in wrongful death actions. Relying on the text and context of ORS 18.560(2)(a), defining "economic damages," defendants argue that the daughter's loss of Tabert's services is not an item of economic damages, because that loss is neither "monetary" nor "objectively verifiable"—indeed, according to defendants, such a loss is inherently incapable of being quantified—and because the expenses resulting from that loss have not yet been "incurred." Plaintiff responds that the loss of future services is an item of pecuniary damage that is capable of proof and that there was evidence in this case regarding the value of Tabert's services.

The question whether damages for a child's loss of a mother's services as provided in ORS 30.020(2)(d) constitutes economic damages within the meaning of ORS 18.560(2)(a) is a question of statutory interpretation to which we again apply the analysis established in *PGE*. We begin by examining the text and context of the relevant statutes. ORS 30.010 *et seq.* provides for wrongful death actions. ORS 30.020(2) provides:

"In an action under this section damages may be awarded in an amount which:

"(a)  Includes reasonable charges necessarily incurred for doctors' services, hospital services, nursing services, other medical services, burial services and memorial services rendered for the decedent;

"(b)  Would justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of

income during the period between injury to the decedent and the decedent's death;

"(c) Justly, fairly and reasonably compensates for pecuniary loss to the decedent's estate;

"(d) Justly, fairly and reasonably compensates the decedent's spouse, children, stepchildren, stepparents and parents for pecuniary loss and for *loss of the society, companionship and services of the decedent*; and

"(e) Separately stated in finding or verdict, the punitive damages, if any, which the decedent would have been entitled to recover from the wrongdoer if the decedent had lived." (Emphasis added.)

ORS 18.560(2) provides:

"(a) 'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less.

"(b) 'Noneconomic damages' means subjective, non-monetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment."

The text of ORS 30.020(2)(d) does not expressly state whether damages for any particular type of expense or loss—such as "loss of * * * services of the decedent"—are "economic" or "noneconomic" damages. Conversely, ORS 18.560(2)(a) does not expressly state that "economic damages" includes the loss of a decedent's services. Indeed, neither statute uses language that particularly tracks the language used in the other to describe the various types of expenses or loss. *See Greist v. Phillips*, 322 Or 281, 290-91,

906 P2d 789 (1995) (noting that ORS 30.020 entitles wrongful death plaintiffs to damages for various types of losses and noting that ORS 18.560 categorizes damages in civil actions as either economic or noneconomic damages). Nevertheless, the text of the respective statutes, as well as a comparison of them to each other, provides an answer to the question presented here.

First, ORS 18.560(2)(a) defines "economic damages" in part as "monetary loss" and defines "noneconomic damages" in part as "nonmonetary losses." Although ORS 30.020(2)(d) does not expressly state whether the legislature regarded the loss of a parent's services as a monetary or a nonmonetary loss, paragraph (2)(d) of ORS 30.020 apparently draws a distinction between "pecuniary loss" and "loss of * * * services." The word "pecuniary" is defined as "taking the form of or consisting of money" and "of or relating to money : MONETARY." *See Webster's Third New Int'l Dictionary* at 1663. The use in one portion of paragraph (2)(d) of the phrase "pecuniary loss" and the use in another portion of that paragraph of the phrase "loss of * * * services" marginally suggests that the legislature did not regard "loss of * * * services" as a form of "pecuniary" or monetary loss and therefore did not intend for that loss to be an item of economic damages.

The legislature's use of the word "services" in ORS 30.020(2)(d), however, suggests a contrary conclusion. As pertinent here, the word "service" means "the performance of work commanded or paid by another"; "an act done for the benefit or at the command of another"; "conduct or performance that assists or benefits someone"; "deeds useful or instrumental toward some object"; "professional or other useful ministrations"; and "useful labor that does not provide a tangible commodity—usu. used in pl. ‹ * * * physicians perform ; s although they produce no goods›." *Id.* at 2075. Those definitions suggest that "services" have monetary value, even if they do not in fact result in the production of tangible goods or in remuneration to the person performing them. Indeed, paragraph (2)(a) of ORS 30.020 refers to "reasonable *charges* * * * for doctors' *services*, hospital *services*, nursing *services*, other medical *services*, [and] burial *services*" (emphasis added); as the word "charges" indicates, each of those types of

"services" typically is rendered for remuneration. Accordingly, the legislature's use of the word "services" in the phrase "loss of * * * services of the decedent" suggests that the latter—including a child's loss of a deceased parent's services—is a form of "monetary" loss and therefore is an item of economic damages within the meaning of ORS 18.560(2)(a). *Cf. Prauss v. Adamski*, 195 Or 1, 244 P2d 598 (1952) ("pecuniary loss" includes a husband's loss of his wife's services; the measure of such damages is their monetary value).

Examination of ORS 18.560(2)(a) also is instructive. As noted, that provision defines "economic damages" in part as "monetary losses" and includes, among other examples of such losses, "charges * * * incurred for medical, hospital, nursing and rehabilitative services" and "expenses incurred for substitute domestic services." The use of the term "services" in the definition of "economic damages" in ORS 18.560(2)(a) confirms what its use in ORS 30.020(2)(a) suggests: that the legislature regards that term as referring to acts having monetary value. The legislature's use of the term in both ORS 30.020(2)(d) and ORS 18.560(2)(a) therefore is additional evidence that a child's loss of a parent's services is an item of economic damages.

Finally, it is also instructive to consider the types of losses that the legislature expressly denominated as noneconomic damages. ORS 18.560(2)(b) first states that noneconomic damages "means subjective, nonmonetary losses." "Subjective" means in part "arising from conditions within the brain or sense organs" and "arising out of or identified by means of an individual's attention to or awareness of his own states and processes." *Webster's Third New Int'l Dictionary* at 2275. Expressly enumerated noneconomic damages include pain and suffering as well as the loss of "care, comfort, companionship and society." The plain meaning of the term "care" is "serious attention; *esp*: attention accompanied by caution, pains, wariness, personal interest, or responsibility" and "CHARGE, SUPERVISION, MANAGEMENT: responsibility for or attention to safety and well-being"; synonyms for "care" include "solicitude" and "concern." *Id.* at 338. Similarly, the plain meaning of the term "comfort" includes "assistance, succor, support, consolation in trouble or worry"

and "solace." *Id.* at 454. "Companionship" means "the quality or state of being a companion"; a "companion" is "one that accompanies or is in the company of another." *Id.* at 461. Finally, "society" means "companionship or association with one's fellows: friendly or intimate intercourse." *Id.* at 2162. We have no difficulty concluding that the loss of a parent's "services" is more like the kinds of loss enumerated in ORS 18.560(2)(a), defining "economic damages," than it is like those enumerated in ORS 18.560(2)(b), defining "noneconomic damages."

In summary, the plain meaning of the term "services" in ORS 30.020(2)(d), as well as the definitions and examples of economic and noneconomic damages provided in ORS 18.560(2)(a) and (b), lead to the conclusion that the legislature intended for "loss of * * * services of a decedent," including a child's loss of a parent's services, to be an item of economic damages.

As noted, defendants also argue that economic damages do not include a child's loss of a parent's services because such a loss is not an "objectively verifiable monetary loss." We have already concluded above that such a loss is a monetary loss. As to whether it is "objectively verifiable," in *DeVaux v. Presby*, 136 Or App 456, 902 P2d 593 (1995), this court determined that, in the context of ORS 18.560(2)(a), "objectively verifiable" means "*capable* of confirmation by reference to empirical facts." *Id.* at 462 (emphasis added). As the court explained, because the legislature used the word "verifiable" rather than "verified," the statute does not impose a particular quantum of proof for recovery of such damages. *Id.*

Similarly, in *Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 928 P2d 980 (1996), the Supreme Court considered the legal standard that governs the sufficiency of the evidence of future lost wages and benefits in a claim under ORS 659.121. The court stated:

> "[A] claim for economic damages necessarily rests on some quantum of evidence that would allow the jury to find that certain events probably would have occurred, or that certain conditions probably would have existed, had it not been for a defendant's wrongful conduct. As this court stated in *Conachan v. Williams*, 266 Or 45, 55, 511 P2d 392 (1973), a

case dealing with a claim of lost earning capacity (quoting with approval *Baxter v. Baker*, 253 Or 376, 392, 454 P2d 855 (1969) (O'Connell, J., dissenting)):

> " 'It is obvious that plaintiff's loss both before and after trial can be approximated only and that the calculation of the loss must rest upon factors which can be employed only in terms of probabilities * * *.' "

> "The lack of absolute certainty does not bar submission of a claim for [future lost pay and benefits]. Only reasonable probability is required. Expert testimony may aid the fact-finder in placing a present value on future earning losses. In doing so, an expert may testify to economic assumptions that necessarily rest on estimates and predictions of uncertain future events. Any weakness can be explored by cross-examination or contrary evidence. *Wilson v. B.F. Goodrich*, 292 Or 626, 631, 642 P2d 644 (1982). Whether the claimed damages were proven is a matter for the fact finder, under appropriate instructions." *Id.* at 472-73.

*See also Richmond v. Zimbrick Logging, Inc.*, 124 Or App 631, 636, 863 P2d 520 (1993), *rev den* 318 Or 459 (1994) (loss of future earnings is not rendered a "subjective loss" simply because there is "inherent speculation" in the task of assessing an individual's lost future earning capacity).

Consistent with the described standards, Tabert's daughter's loss of Tabert's services was "objectively verifiable" within the meaning of ORS 18.560(2)(a).

Finally, defendants argue that, because the definition in ORS 18.560(2)(a) of "economic damages" refers to "charges * * * incurred" for medical and related services and to "expenses * * * incurred" for substitute domestic services, economic damages includes only those losses that have been incurred by the time of trial, and not future losses such as loss of a parent's future services. Defendants are correct that the tense of a verb may be a significant indicator of the legislature's intent as to the meaning of a statute. *Martin v. City of Albany*, 320 Or 175, 181, 880 P2d 926 (1994). For example, in *Shuler v. Distribution Trucking Co.*, 164 Or App 615, 994 P2d 167 (1999), *rev den* 330 Or 375 (2000), this court held that the verb phrase "has testified" demonstrated that the relevant statutory provision applied only to persons who had completed the act of testifying. Here, however, the verb at

issue in this case is simply "incurred." That usage could as easily be shorthand for "to be incurred" as it could be shorthand for "having been incurred." We decline to hold that "loss of * * * services" must have been incurred by the time of trial.

For all of the above reasons, the trial court did not err in instructing the jury that Tabert's daughter's loss of Tabert's services was an item of economic damages.

Affirmed.